TYSON, Judge.
*295 Petitioner, House of Raeford Farms, Inc. ("House of Raeford"), and Respondent, North Carolina Department of Environment and Natural Resources ("DENR"), each appeal from the superior court's judgment affirming in part and reversing in part the Final Agency Decision of the Environmental Management Commission ("EMC"). We affirm in part and remand in part.
*296 I. Background
House of Raeford operates a chicken processing facility near Rose Hill in Duplin County, North Carolina. This facility includes an engineered or designed system to treat the wastewater used during processing. Solids are carried by water outside of the plant to a diffused air flotation system. Solid materials are separated from the water, pumped into a tanker trailer, and transported to a plant operated by another company.
The remaining wastewater is pumped to House of Raeford's primary wastewater lagoon ("Lagoon 1"), which is approximately 795 feet long and 329 feet wide. House of Raeford adds approximately one million gallons of wastewater per day into Lagoon 1. The Lagoon has a design capacity of seven to eight million gallons.
At Lagoon 1, the remaining solid material separates from the water. The skimmed wastewater is gravity fed into a second lagoon ("Lagoon 2"), where it settles further. Wastewater from Lagoon 2 is later pumped approximately two miles to yet a third lagoon to further settle ("Lagoon 3"). House of Raeford applies water from Lagoon 3 to its spray fields. Lagoon 1 is located closest to House of Raeford's processing facility. Lagoon 2 is located directly behind Lagoon 1.
Cabin Branch Creek flows behind the House of Raeford facility and is located very close to Lagoon 2. The creek flows through two ponds, which are former limestone quarries, and eventually joins with Beaverdam Branch Creek. The Cabin Branch Creek drainage basin, which contributes to the flow of the creek behind House of Raeford, encompasses approximately 5.6 miles.
Valley Protein (a/k/a Carolina By-Products) is a rendering facility, which accepts offal from House of Raeford and other animal processing facilities and transforms the offal into other useable products. Valley *914 Protein, along with Duplin Winery, are located upstream from the House of Raeford facility in the Cabin Branch Creek drainage area. Parker Bark, a mulch facility, is located adjacent to the House of Raeford property. Hog and cattle farms are also located within the Cabin Branch Creek drainage basin. Cabin Branch Creek is classified by DENR as swamp waters, which are characteristically wide, shallow, and slow flowing, and fed by wetlands and low-lying areas.
On 9 September 2009, DENR's Division of Water Quality ("DWQ"), Wilmington Regional Office, received an anonymous complaint about an odor emanating from Beaverdam Branch Creek. The following morning, two DENR representatives, Linda Willis ("Willis"), an environmental *297 engineer, and Geoffrey Kegley ("Kegley"), a hydrogeologist, investigated the source of the odor. Willis and Kegley observed a "greasy, brown film" on Beaverdam Branch Creek where the creek crosses Brooks Quinn Road. As a result of this observation, Willis and Kegley began to investigate Beaverdam Branch Creek and its tributaries upstream from Brooks Quinn Road.
Willis and Kegley first investigated two hog farms' lagoons located along one of the tributaries. They determined neither farm was the source of the film on the creek. Willis testified she inspected the hog waste lagoons, observed no "overtopping" and noted the adjacent ditches were dry. Willis also testified she would have seen something in the ditches adjacent to the hog waste lagoons if there had been any problems with the lagoons. She further testified nothing was floating on the surface of the tributary adjacent to the hog farm lagoons.
Just downstream from the House of Raeford facility, Willis and Kegley observed a "floating, brown, sludge-type, greasy biomass" on the surface of Beaverdam Branch Creek. They then visited two sites located upstream from the House of Raeford facility: one on Cabin Branch Creek and the other on an unnamed tributary. Willis and Kegley did not observe any similar material in the water at either of these sites. Dissolved oxygen levels in the Cabin Branch Creek area upstream from the House of Raeford facility were in compliance with the water quality standards for swamp waters.
Willis and Kegley then drove to the House of Raeford facility. Joe Teachey ("Teachey"), the person responsible for the wastewater operations, met with them and escorted them behind the facility to view Cabin Branch Creek. Willis testified, "the creek was just full of sludge from bank to bank and as far as the eye could see. It was an unbelievable site."
She testified the sludge was fresh because it was a light tan color: "It starts out looking like a milkshake and then as it decomposes, it gets [darker] because of the septicity[.]" The sludge adhered to the shorelines and was so thick on the surface of the water that it had formed ridges. The sludge was darker and thinner downstream from the House of Raeford facility.
Willis testified the sludge in the creek appeared similar to the sludge in House of Raeford's Lagoon 1. Willis walked upstream to the adjacent property line. At that location, the water was clear and reflective.
On 17 September 2009, DENR collected fecal samples from Cabin Branch Creek, directly behind the House of Raeford facility. The *298 analysis of the samples confirmed a fecal coliform density greater than 60,000 colonies per 100 milliliters. As a result of the contamination, the designated uses for the swamp waters below the House of Raeford facility were deemed to be impaired.
No direct or physical evidence was presented which tended to show that House of Raeford had discharged sludge into the creek. DENR did not gather or perform any tests on the sludge or material in the creek to determine whether it was the same material contained in House of Raeford's lagoons.
Evidence was presented that House of Raeford had made repairs to the lagoon system in early September 2009. An elevation change between the topography of the lagoons allows water to flow through a pipe from Lagoon 1 to Lagoon 2. These flows are controlled by a valve, which is opened by physically turning a wheel. In early September 2009, the valve and pipe were replaced.
*915 Teachey testified that he began to lower the level of Lagoon 1 approximately a week to ten days before construction began on the repairs. Teachey was able to lower the water level of Lagoon 1 by approximately one foot. The construction and repairs on the pipe and valve occurred between 8 September 2009 and 11 September 2009.
On 15 September 2009, Ms. Willis met with Clay Howard, the operations manager for House of Raeford, and a representative from the Environmental Protection Agency. Mr. Howard retained Register's Septic Tank Pumping, operated by Kenneth Register, to remove the material from Cabin Branch Creek, behind the House of Raeford facility. Mr. Register used a hose to pump material from the creek into his tanker truck, drove to Lagoon 1, and deposited the material therein. Register pumped approximately one million gallons of material, consisting of ninety-percent water, from the creek and deposited it into House of Raeford's Lagoon 1. House of Raeford paid Mr. Register $20,000.00.
Jeffrey O. Poupart, the Point Source Branch Chief for DENR's Division of Water Quality, testified that it is "unheard of" for a company to accept unknown contaminants, such as sludge, into lagoons without first characterizing the contaminant. He stated that unknown contaminants are not accepted due to the risk of causing an imbalance in the lagoon's biological system, as well as the liability risk of accepting potentially hazardous or restricted materials.
Other testimony stated only two facilities in the creek basin area produce a floating sludge, Valley Protein and House of Raeford. DENR ruled out Valley Protein as a source of the creek sludge, because it is *299 located several miles upstream from the site of contamination. No sign of sludge was observed upstream from the House of Raeford facility. DENR also excluded the other possible sources: Duplin Winery, Parker Bark, cattle farms, and hog farms.
Willis testified that, as a result of her investigation, she concluded House of Raeford had lowered the level of Lagoon 1 by pumping the material directly into the creek to accommodate the repair work to the pipe and valve. No physical evidence, such as tire tracks, pipe lanes, spills, or soil disturbance, was presented to show the material was pumped or that a truck hauled sludge from the lagoon to the creek. A ditch runs parallel to the lagoons. Except at the location where the ditch meets the creek, no evidence was presented to show sludge or waste was present in the ditch. In spite of the lack of any direct or physical evidence, DENR concluded House of Raeford had contaminated the creek.
In January of 2011, House of Raeford retained James K. Holley, PG, a hydrogeologist, to perform an independent review of possible causes of the contamination. Mr. Holley was tendered and testified, without objection, as an expert in the field of hydrogeology. He testified there was evidence of potential upstream contributors to the conditions observed in Cabin Branch Creek in September 2009. That evidence included past reports and notices of violation from DENR regarding illicit discharges at both Valley Protein and Duplin Winery.
Mr. Holley also testified that certain physical characteristics of Cabin Brank Creek could explain the natural accumulation of material behind the facility. The area of the creek behind the House of Raeford facility serves as a natural trapping point for materials flushed downstream. Immediately downstream from the facility, the creek contains numerous fallen trees and sharp turns, which serve as physical impediments to the water flow and debris carried downstream. The narrow stream channel behind House of Raeford enters an abandoned limestone quarry pond. As water exits this narrow stream and enters the large pond feature, the velocity of the flow drops, which causes the flow to slow and back up. In Mr. Holley's expert opinion, it is possible for matter to accumulate over a period of time at this "natural trapping point" from the release of materials further upstream, and naturally occurring debris in the creek.
Mr. Holley also testified that beavers create significant drainage problems for creeks like Cabin Branch. Beavers build dams, which cause water to slow, pond, trap debris, and stagnate. A couple of months earlier, on *916 16 June 2009, the Natural Resources Conservation Service had sent a letter to DENR that indicated "the volume of standing water *300 in this drainage system has been improved by removal of beavers and beaver dams obstructing the flow of water. The Beaver Management Assistance Program (BMAP) was employed to trap the creek from the railroad to HWY 117." This area of the BMAP eradication of beaver dams is downstream from Valley Protein, but upstream from House of Raeford.
In addition, Mr. Holley testified low volumes of rainfall occurred from July until early August 2009, and the ground was dry. In August, two significant rainfalls occurred, which raised the water levels, mobilized and trapped upstream material, and flushed it downstream. In Mr. Holley's expert opinion, the material in the creek behind House of Raeford could have accumulated over a period of days, weeks or months.
On or about 10 August 2010, DENR issued a Findings and Decision and Assessment of Civil Penalties against House of Raeford arising out of the alleged discharge into Cabin Branch Creek. DENR assessed total civil penalties against House of Raeford in the amount of $75,000.00, plus enforcement costs of $1,357.95 as follows: (1) a penalty of $25,000.00 was assessed for an alleged violation of N.C. Gen.Stat. § 143-215.1(a)(6). DENR asserted House of Raeford caused or permitted waste to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications, or in violation of any effluent standards or limitations established for any point source, unless allowed as a condition of any permit, special order or other appropriate instrument issued or entered into by the EMC; (2) a penalty of $25,000.00 was assessed for violation of 15A N.C.A.C. 2B.0211(3)(b) for violating the dissolved oxygen water quality standard for Class C-Sw waters of the State; and, (3) a penalty of $25,000.00 was assessed for violation of 15A N.C.A.C. 2B.0211(3)(c) for allowing settleable solids and sludge in excess of the water quality standard for Class C-Sw waters of the State.
House of Raeford timely filed a petition for a contested case hearing. These hearings took place on various dates between 25 October 2011 and 20 December 2011. On 30 May 2012, the administrative law judge ("ALJ") issued his recommended decision, which: (1) upheld the imposition of a $25,000.00 fine for violation of N.C. Gen.Stat. § 143-215.1(a)(6) ; (2) found that imposition of both $25,000.00 fines for violations of 15A N.C.A.C. 2B.0211(3)(b) and 15A N.C.A.C. 2B.0211(3)(c) respectively, were improper and in error; and, (3) reduced the enforcement costs charged against House of Raeford from $1,357.95 to $452.65.
House of Raeford and DENR both submitted exceptions and objections to the ALJ's recommended decision and requested oral argument *301 before the EMC. On 8 October 2012, the EMC, by a divided majority vote, issued its Final Agency Decision. The majority adopted in part and rejected in part the recommended decision of the ALJ. The EMC imposed a total civil penalty of $50,000.00 and enforcement costs of $905.30 against House of Raeford for violation of N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C.A.C. 2B.0211(3)(c).
On 9 November 2012, House of Raeford timely filed a Petition for Judicial Review of the Decision in the Duplin County Superior Court. A hearing was held on 14 April 2014. On 30 May 2014, the court agreed with the ALJ, imposed a single $25,000.00 fine for violation of N.C. Gen.Stat. § 143-215.1(a)(6) and enforcement costs of $452.65, and issued a Judgment on Judicial Review. DENR appeals, and House of Raeford cross-appeals.
II. Issues
House of Raeford argues the superior court erred by: (1) allocating the burden of proof to House of Raeford, rather than DENR; and, (2) concluding that House of Raeford violated N.C. Gen.Stat. § 143-215.1(a)(6).
DENR argues the superior court erred by: (1) reversing the Commission's decision upholding DENR's assessment of two $25,000.00 civil penalties and costs against House of Raeford for violating its non-discharge permit and violating water quality *917 standards for settleable solids or sludge; and, (2) failing to defer to the Commission's decision upholding DENR's assessment of more than one civil penalty.
III. Standard of Review
The superior court's review of the EMC's Final Agency Decision is governed by N.C. Gen.Stat. § 150B-51, which provides:
(b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional provisions;
(2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
*302 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
(6) Arbitrary, capricious, or an abuse of discretion.
(c) In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record. With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.
N.C. Gen.Stat. § 150B-51(b) - (c) (2013) ; see also N.C. Dep't of Env't & Natural Res. v. Carroll, 358 N.C. 649, 658-59, 599 S.E.2d 888, 894 (2004) (An agency's Final Decision may be reversed or modified "only if the reviewing court determines that the petitioner's substantial rights may have been prejudiced because the agency's findings, inferences, conclusions, or decision [fall into one of the six categories listed in § 150B-51(b) ]."). "This Court's scope of review is the same as that employed by the trial court." Overcash v. N.C. Dep't of Env't & Natural Res., 179 N.C.App. 697, 702, 635 S.E.2d 442, 446 (2006), disc. review denied, 361 N.C. 220, 642 S.E.2d 445 (2007). "Under the de novo standard of review, the trial court consider[s] the matter anew[ ] and freely substitutes its own judgment for the agency's." Carroll, 358 N.C. at 660, 599 S.E.2d at 895.
Under the whole record test
the trial court may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter de novo. Rather, a court must examine all the record evidence-that which detracts from the agency's findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the agency's decision. Substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion.
*303 Overcash, 179 N.C.App. at 703, 635 S.E.2d at 446-47 (citation and internal quotation marks omitted).
IV. Burden of Proof
House of Raeford argues the trial court improperly placed the burden of proof on House of Raeford to prove it did not discharge the material into Cabin Branch Creek, rather than requiring DENR to prove the allegations. We disagree.
The superior court concluded:
7. The North Carolina courts have generally allocated the burden of proof in any dispute on the party attempting to show the existence of a claim or cause of action, and if proof of his claim includes proof of negative allegations, it is incumbent on him to do so. Peace v. Empl. Sec. Com'n of N.C., 349 N.C. 315, 507 S.E.2d 272 (1998) citing Johnson v. Johnson, 229 N.C. 541, 50 S.E.2d 569 (1948). Generally, a Petitioner bears the burden of proof on the *918 issues. To meet this burden, Petitioner must show that Respondent substantially prejudiced its rights and exceeded its authority or jurisdiction, acted erroneously, failed to use proper procedure, acted arbitrarily or capriciously, or failed to act as required by law or rule. "The party with the burden of proof in a contested case must establish the facts required by G.S. 150B-23(a) by a preponderance of the evidence." Britthaven [, Inc. ] v. N.C. Dept. of Human Resources, 118 N.C.App. 379, 455 S.E.2d 455, rev. den., 341 N.C. 418, 461 S.E.2d 754 (1995). Petitioner in this case carries the burden of proof.
N.C. Gen.Stat. § 150B-23(a) provides:
A contested case shall be commenced by ... filing a petition with the Office of Administrative Hearings.... [I]f filed by a party other than an agency, [the petition] shall state facts tending to establish that the agency named as the respondent ... has ordered the petitioner to pay a fine or civil penalty ... and that the agency:
(1) Exceeded its authority or jurisdiction;
(2) Acted erroneously;
(3) Failed to use proper procedure;
*304 (4) Acted arbitrarily or capriciously; or
(5) Failed to act as required by law or rule.
N.C. Gen.Stat. § 150B-29(a) (2013) ; see also N.C. Gen.Stat. § 150B-29(a) (2013) ("The party with the burden of proof in a contested case must establish the facts required by G.S. 150B-23(a) by a preponderance of the evidence.").
In Overcash, this Court explained:
While neither of these statutes specifically allocates the burden of proof, this Court held in Britthaven, Inc. v. N.C. Dep't of Human Res., 118 N.C.App. 379, 382, 455 S.E.2d 455, 459 (emphasis omitted), disc. review denied, 341 N.C. 418, 461 S.E.2d 754 (1995), that 'the ALJ is to determine whether the petitioner has met its burden in showing that the agency' acted or failed to act as provided in § 150B-23(a)(1)-(5). Likewise, in Holly Ridge Assocs., LLC v. N.C. Dep't of Env't & Natural Res., 176 N.C.App. 594, 608, 627 S.E.2d 326, 337 (2006) [rev'd on other grounds, 361 N.C. 531, 648 S.E.2d 830 (2007) ], this Court observed that 'caselaw holds that unless a statute provides otherwise, petitioner has the burden of proof in OAH contested cases.' Applying this principle, the Court concluded that the petitioner-and not DENR-bore the burden of proving the violations specified in N.C. Gen.Stat. § 150B-23(a). Holly Ridge, 176 N.C.App. at 608, 627 S.E.2d at 337. In short, this Court has already held that the burden of proof rests on the petitioner challenging an agency decision.
Overcash, 179 N.C.App. at 704, 635 S.E.2d at 447.
We are bound by our prior decisions in Overcash, Britthaven , and Holly Ridge, and hold the trial court did not err in its allocation of the burden of proof. "[A] panel of the Court of Appeals is bound by a prior decision of another panel of the same court addressing the same question, but in a different case, unless overturned by an intervening decision from a higher court." In re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). This argument is overruled.
V. Violation of N.C. Gen.Stat. § 143-215.1(a)(6)
House of Raeford asserts the superior court erred by concluding it violated the provisions of N.C. Gen.Stat. § 143-215.1(a)(6) by dumping waste material into Cabin Branch Creek, and upholding the assessment of a civil penalty.
*305 House of Raeford argues: (1) no substantial evidence shows a similarity between the sludge in the lagoon and the material in the creek; (2) no substantial evidence supports the finding that there was no sludge upstream from the House of Raeford facility, and ruling out of other possible sources of the sludge; (3) House of Raeford's allowance of the material from the creek into its lagoon should not be considered as an admission of it being the source of the sludge; and, (4) DENR presented no evidence to show how material could have moved from House of Raeford's lagoon into the creek.
DENR's conclusion that House of Raeford dumped sludge into Cabin Branch Creek was based upon wholly circumstantial *919 evidence. "It has long been the law in our state that circumstantial evidence may be used, and is highly satisfactory in matter of gravest moment[.]" State v. Cummings, 267 N.C. 300, 301, 148 S.E.2d 97, 98 (1966). Testimony was presented that (1) the creek directly behind the House of Raeford facility contained a large volume of sludge; (2) the material in the creek was visually similar to the material in House of Raeford's Lagoon 1; (3) the sludge in the creek appeared to be fresh; (4) the creek was clear upstream from the House of Raeford facility; (5) House of Raeford paid $20,000.00 to pump the sludge from the creek into its lagoon and it is "unheard of" for a company to accept unknown contaminants into its wastewater system; (6) House of Raeford lowered the level of Lagoon 1 to accommodate repairs within a week of the discovery of the sludge in the creek; and, (7) DENR's investigation ruled out other possible upstream sources for the sludge.
We recognize the ALJ and EMC tribunals have "unchallenged superiority to act as finders of fact." Carroll, 358 N.C. at 662, 599 S.E.2d at 896 (citation omitted). Where there are two conflicting views, this Court should not substitute our judgment for that of the agency's, even though this Court "could reasonably have reached a different result had [we] reviewed the matter de novo. " Overcash, 179 N.C.App. at 703, 635 S.E.2d at 447 (citation omitted). Circumstantial evidence was presented by DENR which tended to show House of Raeford caused or permitted waste to be discharged into Cabin Branch Creek without an applicable permit and in violation of N.C. Gen.Stat. § 143-215.1(a)(6) and the water quality standards. Id. at 702, 635 S.E.2d at 446.
N.C. Gen.Stat. § 143-215.6A(a) allows a civil penalty up to a maximum of $25,000.00 per violation, to be assessed for violations of the eleven enumerated restrictions set forth in the statute. In assessing the amount of the civil penalty, the factors set forth in N.C. Gen.Stat. § 143B-282.1 shall be considered:
*306 (1) The degree and extent of harm to the natural resources of the State, to the public health, or to private property resulting from the violation;
(2) The duration and gravity of the violation;
(3) The effect on ground or surface water quantity or quality or on air quality;
(4) The cost of rectifying the damage;
(5) The amount of money saved by noncompliance;
(6) Whether the violation was committed willfully or intentionally;
(7) The prior record of the violator in complying or failing to comply with programs over which the Environmental Management Commission has regulatory authority; and
(8) The cost to the State of the enforcement procedures.
N.C. Gen.Stat. § 143B-282.1(b) (2013).
Jeffrey Poupart, the Point Source Branch Chief for DENR's Division of Water Quality, made "findings of fact" and "conclusions of law" and assessed three maximum civil penalties against House of Raeford. Poupart oversees the permitting and compliance for all point source wastewater facilities in the State.
Poupart's decision does not state, with any specificity, facts to support consideration and application of the factors set forth in N.C. Gen.Stat. § 143B-282.1(b). In Poupart's decision, he states he "considered" these factors set forth in the statute, and then lists the statutory factors.
The ALJ's decision contains only one finding of fact pertaining to these statutory factors:
64. The test results performed by DWQ in September 2009, throughout the drainage basin for Cabin Branch Creek, from its headwaters to the downstream reaches, showed low [dissolved oxygen] levels that could not be assigned to the presence of the matter found in the creek behind the [House of Raeford] facility. Low dissolved oxygen was a systematic problem throughout Cabin Branch and its tributaries. (Emphasis supplied).
In its Final Agency Decision, the EMC incorporated all of the ALJ's findings of fact verbatim, with the addition of the finding that the cost of *307 DWQ's investigation and *920 monitoring of the water quality totaled $1,357.95. The superior court also adopted the findings of the ALJ verbatim.
Poupart testified before the ALJ regarding his assessment of the eight statutory factors. Poupart testified the sludge behind the facility covered the stream from bank to bank, inhibiting the movement of aquatic life, and causing a "severe[ ] adverse affect on [the] water environment." The dissolved oxygen in the creek was "very depressed for 13 days" and unable to support the ecosystem, and the water in the creek was septic for a significant stretch downstream from the facility. Poupart also testified of at least twenty-five other civil penalty assessments against House of Raeford in the five years preceding the violation, which was a "significant factor" in the penalty assessment. He did not testify regarding the details of the twenty-five past violations. Poupart referenced a spreadsheet which summarized the past violations. None of the finders of fact made any findings regarding House of Raeford's past violations. Poupart further testified that the cost to the State for enforcement procedures was "moderately significant."
House of Raeford was assessed the maximum statutory penalty. The record shows that DENR discovered the material in the creek on 9 September 2009, and met with a representative from House of Raeford. That same day, House of Raeford contracted with a company to pump the material from the creek into House of Raeford's Lagoon 1. The record is unclear whether the pumping of the material began on 9 September or 14 September 2009. Nevertheless, the record clearly shows House of Raeford took timely action, upon the EPA's and DENR's request, to remove the material from the creek and placed it in its lagoon. No evidence shows there was any further remediation required or performed by anyone else, or there was any lasting or long-term impact on the creek. In assessing the civil penalty, DENR did not consider the $20,000.00 House of Raeford had spent in pumping the material from the creek and into its lagoon.
The orders from the lower court and tribunals baldly state that Poupart "considered" the eight statutory factors in assessing the civil penalty, but contain no findings of fact to support these factors. Furthermore, Poupart's testimony before the ALJ contains bald statements regarding the environmental impact from the discharge. No evidence was presented tending to show the State spent significant funds to enforce the water quality regulations, or that any additional funds were expended, or should have been expended, to remediate the damage.
*308 In light of these considerations, we remand to the superior court with instructions to remand to the finder of fact, to make specific findings with regard to the eight statutory factors set forth in N.C. Gen.Stat. § 143B-282.1(b) and to formulate the amount of any civil penalty to be imposed.
VI. Duplicative Assessment of Civil Penalties
DENR assessed civil penalties against House of Raeford as follows:
$25,000 for violation of N.C. Gen.Stat. § 143-215.1(a)(6) ; causing or permitting waste to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications or in violation of any effluent standards or limitations established for any point source, unless allowed as a condition of any permit, special order or other appropriate instrument issued or entered into by the Commission under the provisions of the Article.
$25,000 for violation of 15A N.C.A.C. 2B.0211(3)(b) ; violating the dissolved oxygen water quality standard for Class C-Sw waters of the State.
$25,000 for violation of 15A N.C.A.C. 2B.0211(3)(c) ; by allowing settleable solids and sludge in excess of the water quality standard for Class C-Sw waters of the State.
The ALJ found the imposition of civil penalties under 15A N.C.A.C. 2B.0211(3)(b) and 15A N.C.A.C. 2B.0211(3)(c) were erroneous, but upheld the imposition of the $25,000.00 fine under N.C. Gen.Stat. § 143-215.1(a)(6). The EMC imposed a total maximum civil penalty of $50,000.00 against House of Raeford *921 for violation of N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C.A.C. 2B.0211(3)(c).
The superior court assessed a civil penalty of $25,000.00 for violation of N.C. Gen. Stat § 143-215.1(a)(6) for causing or permitting waste to be discharged into or intermixed with the waters of the State in violation of the water quality standard set forth in 15A N.C.A.C. 2B.0211(3)(c). DENR argues the superior court erred by determining that House of Raeford was fined "twice for the same violation," and assessing only one civil penalty. We disagree.
The General Assembly has authorized the assessment of civil penalties of "not more than twenty-five thousand dollars" for eleven itemized violations based on acts or failures to act.
*309 N.C. Gen.Stat. § 143-215.6A(a)(1-11) (2013). The statute does not impose any limitation on the number of violations to be found as a result of an unauthorized discharge.
The violation of 15A N.C.A.C. 2B.0211(3)(b) related to the dissolved oxygen water quality standard is not at issue. The EMC concluded the penalty should be vacated, and DENR sets forth no argument related to that violation. DENR asserts that the civil penalties under N.C. Gen. Stat § 143-215.1(a)(6) and 15A N.C.A.C. 2B.0211(3)(c) were assessed as a result of the same physical discharge of material into the creek, but each violation is based upon a separate act or failure to act. We disagree.
N.C. Gen.Stat. § 143-215.1(a)(6) provides that no person shall:
Cause or permit any waste, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications or in violation of any effluent standards or limitations established for any point source, unless allowed as a condition of any permit, special order or other appropriate instrument issued or entered into by the Commission under the provisions of this Article.
N.C. Gen.Stat. § 143-215.1(a)(6) (2013) (emphasis supplied). DENR specifically alleged House of Raeford had "violated N.C. Gen.Stat. § 143-215.1(a)(6) by causing or permitting a waste, directly or indirectly, to be discharged to or in any manner intermixed with the waters of the State in violation of the water quality standards applicable to the assigned classifications."
The second maximum penalty assessment was for "violation" of 15A N.C.A.C. 2B.0211(3)(c), a subsection of the North Carolina Administrative Code that sets forth water quality standards. Section 15A N.C.A.C. 2B.0211 is entitled "Fresh Surface Water Quality Standards for Class C Waters." The regulation provides:
(3) Quality standards applicable to all fresh surface waters:
....
(c) Floating solids, settleable solids, or sludge deposits: only such amounts attributable to sewage, industrial wastes or other wastes as shall not make the water unsafe or unsuitable for aquatic life and wildlife or impair the waters for any designated uses.
15A N.C.A.C. 2B.0211(3)(c) (2011).
*310 In contrast to the language of N.C. Gen.Stat. § 143-215.1(a)(6), the regulation is not prohibitory, nor does it mandate some action. It merely sets forth the water quality standards for Class C waters. N.C. Gen.Stat. § 143-215.1(a)(6) allows for a penalty for violating the water quality standards set forth in 15A N.C.A.C. 2B.0211(3)(c). While under other circumstances there may be grounds to impose separate penalties associated with a single discharge, a violation of N.C. Gen.Stat. § 143-215.1(a)(6) does not exist without a violation of the water quality standard. The superior court properly determined the two penalties assessed by the EMC were duplicative and impermissible. This argument is overruled.
VII. Deference to the EMC's Decision
DENR asserts the superior court erred by failing to defer to the EMC's Final Agency Decision, which upheld DENR's assessment of two civil penalties based upon violations of N.C. Gen.Stat. § 143-215.1(a)(6) and 15A N.C.A.C. 2B.0211(3)(c). DENR argues the superior court should have deferred to the EMC's Decision, wherein EMC interpreted *922 its own regulations, and based on the EMC's expertise in administering the statutory program delegated to it by the General Assembly. We disagree.
DENR is vested with the statutory authority to administer the State's "program of water and air pollution control and water resource management." N.C. Gen.Stat. § 143-211(c) (2013). The EMC is responsible for promulgating rules and policies regulating the State's surface water resources. See N.C. Gen. Stat. §§ 143-214.1, 143-215.1, 143-215.6A (2013). "[A]n administrative agency's interpretation of its own regulation is to be given due deference by the courts unless it is plainly erroneous or inconsistent with the regulation." Pamlico Marine Co. v. N.C. Dep't of Natural Res. & Cmty. Dev., 80 N.C.App. 201, 206, 341 S.E.2d 108, 112 (1986).
Our Supreme Court explained:
Although the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, those interpretations are not binding. The weight of such [an interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
In re Appeal of N.C. Sav. & Loan League, 302 N.C. 458, 466, 276 S.E.2d 404, 410 (1981) (emphasis supplied). "An agency interpretation of a *311 relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." Martin v. N.C. Dep't of Health & Human Servs., 194 N.C.App. 716, 724, 670 S.E.2d 629, 635 (2009) (citation and quotation marks omitted).
The ALJ and the superior court both ruled that DENR improperly assessed duplicative penalties for discharging into the waters of the State in violation of N.C Gen.Stat. § 143-215.1(a)(6), and for violating the water quality standard set forth in 15A N.C.A.C. 2B.0211(3)(c). The superior court properly reviewed and ruled the EMC Final Decision and assessment of the two additional maximum civil penalties was error. This assignment of error is overruled.
VIII. Conclusion
The superior court did not err in concluding that substantial circumstantial evidence was presented that House of Raeford violated the provisions of N.C Gen.Stat. § 143-215.1(a)(6) by discharging material into the creek. The superior court properly concluded that imposition of two separate penalties under N.C Gen.Stat. § 143-215.1(a)(6) and 15A N.C.A.C. 2B.0211(3)(c) was in error.
We remand to the superior court with instructions to remand to the finder of fact for further findings regarding House of Raeford's actions, timeliness, and other evidence in light of the eight statutory factors set forth in N.C. Gen.Stat. § 143B-282.1(b), and for further consideration of the amount of any civil penalty to be imposed. The judgment of the superior court is affirmed in part, and remanded in part.
AFFIRMED IN PART, REMANDED IN PART.
Chief Judge McGEE and Judge GEER concur.