An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-203

Filed 18 February 2026

North Carolina Utilities Commission, No. E-7, SUB 1304

IN THE MATTER OF: APPLICATION OF DUKE ENERGY CAROLINAS, LLC, PURSUANT TO N.C.G.S. § 62-133.2 AND COMMISSION RULE R8-55 RELATING TO FUEL AND FUEL-RELATED CHARGE ADJUSTMENTS FOR ELECTRIC UTILITIES

Appeal by intervenor Public Staff from order entered 20 August 2024 by the North Carolina Utilities Commission. Heard in the Court of Appeals 14 January 2026.

> *McGuireWoods LLP, by Jonathan Y. Ellis, E. Brett Breitschwerdt, and H. Brent McKnight, Jr., and Jack E. Jirak and Ladawn S. Toon, Counsel for Duke Energy Corporation, for applicant-appellees.*

> *William S. F. Freeman, Lucy E. Edmondson, and William E. H. Creech, for The Public Staff of the North Carolina Utilities Commission, intervenor-appellant.*

> *No brief filed by Ward and Smith, P.A., by Christopher S. Edwards, Alex C. Dale, and Christina D. Cress, Counsel for Carolina Utility Customers Association, Inc. and Carolina Industrial Group for Fair Utility Rates III, intervenors.*

ARROWOOD, Judge.

The Public Staff of the North Carolina Utilities Commission ("Public Staff") appeals from an order by the North Carolina Utilities Commission ("Commission")

approving fuel charge adjustments for Duke Energy Carolinas, LLC ("DEC"). For the following reasons, we reverse the decision and order.

## I.        Background

DEC is a public utility that provides electricity throughout North Carolina. As a public utility, the rates that DEC can charge customers is set by the North Carolina Utilities Commission. N.C.G.S. § 62-130 (2025). The Public Staff is a government agency tasked with representing the interests of the public in matters before the Commission, including in proceedings to determine public utility rates. N.C.G.S. § 62-15(b), (d) (2025).

The rates that DEC charges customers include a "base rate," which covers the general costs of operating the utility, and a "fuel rider," which accounts for changes in the cost of fuel and fuel-related costs through a rate increment or decrement. *See* N.C.G.S. § 62-133.2(a) (2025). The fuel rider is determined through an annual proceeding before the Commission. *Id.* at § 62-133.2(a)–(b). At the Fuel Rider proceeding, the utility presents a wide range of data from a historic 12-month test period related to fuel costs and power sales. *Id.* at § 62-133.2(c). From that data, the Commission predicts the fuel costs for the upcoming year and sets a rate designed to compensate for those costs. Additionally, because the predictions are inherently imperfect, the Commission assesses the over or under-recovery of fuel costs during the test period and adds those to the upcoming fuel rider in what it deems an "Experience Modification Factor" ("EMF").

Thus, the fuel rider includes two components: (1) a forward-looking component that covers anticipated fuel costs in the next year, and (2) the EMF, a backwards-looking component designed to "true-up" any differences between past anticipated costs and actual costs. For example, if a fuel rider brought in $2 million to cover anticipated fuel costs but the utility actually experienced $3 million in fuel costs, then the EMF would compensate for the under-recovery of $1 million. Conversely, if the fuel rider brought in $3 million but the utility experienced only $2 million in fuel costs, then the EMF would credit the over-recovery of $1 million to customers.

In its 2023 fuel rider proceeding, DEC reported under-recoveries of $998 million in fuel costs during the 2022 test period. The Commission set a 2023 fuel rider designed to recover that amount. However, in its 2024 fuel rider proceeding, DEC reported that the 2023 fuel rider was not on track to recover the 2022 fuel costs. Even with the 2023 fuel rider, DEC identified an under-recovery of $8 million of the 2022 fuel costs. DEC asked that the extra under-recovery of the 2022 costs be included in the 2024 fuel rider, alongside the 2023 under-recovery and anticipated 2024 fuel costs. Public Staff intervened and objected to DEC's request. The Carolina Utility Customers Association, Inc. and the Carolina Industrial Group for Fair Utility Rates III also intervened and later entered into a settlement agreement with DEC on 7 June 2024. A public hearing on DEC's proposed EMF was held on 10 June 2024.

The Commission sided with DEC, accepting the settlement agreement and setting the 2024 fuel rider rates to recover the leftover under-recoveries from 2022.

The Commission issued its Order Accepting Settlement Agreement and Approving Fuel Charge Adjustment on 20 August 2024. In accordance with that Order, the Commission then issued its Order Approving Notices to Customers of Change in Rates on 10 September 2024. Public Staff appealed the Commission's Orders approving DEC's 2024 fuel rider on 18 October 2024.

## II. Discussion

Public Staff argues that the Commission erred as a matter of law in setting rates to allow for the recovery of fuel costs incurred outside of the one-year lookback period allowed by N.C.G.S. § 62-133.2. For the following reasons, we reverse the Commission's Order.

### A. Standard of Review

The rates fixed by the Commission are presumed to be just and reasonable. N.C.G.S. § 62-94(e) (2025); *State ex rel. Utils. Comm'n v. Stein*, 375 N.C. 870, 899 (2020). However, the Commission's conclusions of law are subject to *de novo* review on appeal. *Stein*, 375 N.C. at 900.

### B. N.C.G.S. § 62-133.2

Public Staff contends that the EMF provision of N.C.G.S. § 62-133.2 has a one-year lookback limitation and may only provide a true-up for under-recoveries of fuel costs incurred in the prior test period. Meanwhile, DEC argues that N.C.G.S. § 62-133.2 allows the Commission to include under-recovered EMF balances from previous fuel-rider proceedings when setting the fuel-rider rate.

When interpreting a statute, the intent of the legislature controls. *C Investments 2, LLC v. Auger*, 383 N.C. 1, 8 (2022). The Court shall "first look to the plain language [of a statute], as the actual words of the legislature are the clearest manifestation of its intent." *Cohane v. Home Missioners of America*, 387 N.C. 1, 7–8 (2025) (quoting *Fearrington v. City of Greenville*, 386 N.C. 38, 52 (2024)). "[W]ords and phrases are interpreted in their statutory context, and traditional rules of grammar apply. Where the statute's language is clear and unambiguous, courts must construe it using its plain meaning." *Id.* (citations omitted).

"If the plain language of the statute is ambiguous, however, we then look to other methods of statutory construction such as the broader statutory context, the structure of the statute, and certain canons of statutory construction to ascertain the legislature's intent." *Sturdivant v. N.C. Dep't of Pub. Safety*, 386 N.C. 939, 944 (2024) (quoting *Wynn v. Frederick*, 385 N.C. 576, 581 (2023)). "Additionally, the legislature's intent may be revealed from the legislative history of the statute in question as changes the legislature makes to a statute's text over time provide evidence of the statute's intended meaning." *Wynn*, 385 N.C. at 582 (citations omitted).

### 1. Plain Language

Here, N.C.G.S. § 62-133.2's plain language indicates that the statute was intended to provide a true-up only for the fuel costs that were incurred during the test period. N.C.G.S. § 62-133.2(d) states that "[t]he Commission shall incorporate in its cost of fuel and fuel-related costs determination under this subsection the

experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred during the test period." N.C.G.S. § 62-133.2(d) (2023).[1] Read plainly, the phrase "during the test period" modifies "prudently incurred." That plain reading is also supported by the doctrine of the last antecedent which states that " 'relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding' rather than 'extending to or including others more remote,' 'unless the context indicates a contrary intent.' " *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 545, 548 (2018) (quoting *HCA Crossroads Residential Ctrs., Inc. v. N.C. Dep't of Human Res.*, 327 N.C. 573, 578 (1990)).

Additionally, "incur" means "[t]o suffer or bring on oneself." *Incur*, BLACK'S LAW DICTIONARY (12th ed. 2024). Combining that with the modifying phrase, the text of § 62-133.2(d) limits EMFs to only compensate for the over-recovery or under-recovery of fuel costs that the utility brought upon itself during the test period. In practice, this means that the 2024 fuel rider EMF component could only provide for the under-recovery of 2023's original fuel costs. Thus, the under-recovery of 2022's fuel costs cannot be incorporated into the 2024 fuel rider.

2.      Statutory Context and Structure

---

[1] After the Commission's Order approving the 2024 fuel rider was issued, the General Assembly amended N.C.G.S. § 62-133.2(d). For the reasons discussed below, the amended language does not apply to this decision. Accordingly, we consider whether the Commission correctly interpreted N.C.G.S. § 62-133.2(d) as it existed at the time of the Commission's Order.

DEC provides a contextual argument that the phrase "experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred" is a stand-alone phrase and "during the test period" modifies the whole phrase. Under that interpretation, the statute would allow EMFs to compensate for any over or under-recovered fuel costs experienced during the test period, so long as those costs were prudently incurred. Thus, because the extra under-recovery of the 2022 fuel costs was experienced in 2023, it would be able to be included in the 2024 EMF.

However, DEC's reading of "experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred" as a stand-alone phrase is not supported by the text of the statute. That phrase appears again later in section (d): "The Commission shall allow only that portion, if any, of a requested cost of fuel and fuel-related costs adjustment that is based on adjusted and reasonable cost of fuel and fuel-related costs prudently incurred *under efficient management and economic operations.*" N.C.G.S. § 62-133.2(d) (emphasis added). In that sentence, "under efficient management and economic operations" clearly describes how the fuel costs must be "prudently incurred." Applying that same structure, the portion of the statute at issue should be read such that "during the test period" describes *when* the fuel costs must be incurred.

Additionally, looking beyond § 62-133.2 to the rest of the statutory scheme makes it clear that "experienced over-recovery or under-recovery of reasonable costs

of fuel and fuel-related costs prudently incurred" is not a stand-alone phrase. Throughout Chapter 62, the term "prudently incurred" is used to modify "costs" within varying sentence structures, each changing how the phrase operates. *See* N.C.G.S. §§ 62-110.7, 62-133.4, 62-133.7A, 62-133.12 (2025).

For example, § 62-133.4, which allows utilities to change their rates to track changes in the cost of natural gas, states that the Commission shall "compare the utility's *prudently incurred* costs with costs recovered from all the utility's customers that it served during the test period. If those *prudently incurred* costs are greater or less than the recovered costs, the Commission shall" permit rate changes to compensate for the over or under-recovery. § 62-133.4 (2025) (emphasis added). There, the placement of "prudently incurred" immediately before "costs" makes it clear that "prudently incurred" is modifying "costs" and is not in turn being modified by the rest of the sentence.

"Prudently incurred" is also frequently paired with "reasonable" such as in § 62-133.12 which states that the Commission may approve rate adjustments to compensate for "the utility's *reasonable and prudently incurred* investment in eligible water and sewer system improvements." § 62-133.12(a) (emphasis added). If the legislature intended the statute to align with DEC's interpretation of § 62-133.2(d), they could have similarly written the provision to incorporate the phrase "experienced over-recovery or under-recovery of reasonable and prudently incurred costs of fuel and fuel-related costs during the test period." Instead, by moving

"prudently incurred" to the end of the phrase immediately before "during the test period," the drafters demonstrated an intent that the provision apply only to those costs incurred during the test period.

DEC alternatively argues that even if the phrase "during the test period" only modifies "prudently incurred," the Commission's ultimate conclusion should still be upheld because the EMF balance, that is "any under-recovery or over-recovery," should be incorporated into the "incurred" fuel costs. To support its contention, DEC cites the portion of § 62-133.2(d) at issue which requires that the Commission "incorporate in its cost of fuel and fuel-related costs determination under this subsection the experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred during the test period." § 62-133.2(d).

However, the statute does not incorporate "any under-recovery or over-recovery" into the fuel cost determination. As explained above, it incorporates only the over or under-recovery of fuel costs incurred during the test period. Moreover, since "the experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred during the test period" is itself the explanation of what should be incorporated into the fuel costs determination, it would be improper to redefine the terms within the explanation.

### 3. Legislative History

DEC also contends that the legislative history of § 62-133.2(d) supports its interpretation and demonstrates an intent to eliminate over or under-recovery. § 62-

133.2 was originally ratified in 1982. *See* An Act to Amend Chapter 62 of the General Statutes to Provide for Utilities Commission Consideration of Annual Fuel Adjustment to Electric Utility Rates Established Pursuant to G.S. 62-133, ch. 1197, 1981 N.C. Sess. Law, 99, 99–100. The original text of section (d) read: "The Commission may also consider, but is not bound by, the fuel costs incurred by the utility and the actual recovery under the rate in effect during the test period . . . ." *Id.* § 1; *State ex rel. Utils. Comm'n v. Thornburg*, 84 N.C. App. 482, 485 (1987). Based on that language, the Commission approved its first EMF in 1985 which was designed to recoup the under-recovery of fuel costs that Carolina Power & Light had incurred during the test period. *See Thornburg*, 84 N.C. App. at 482–83. Public Staff appealed the Commission's order, arguing that the Commission did not have the authority to approve EMFs. *See id.*

On 14 August 1986, while the appeal was pending, the Commission issued a Rulemaking Order which revised Commission Rule R8-55 to adopt EMFs. Rule R8-55 stated "[t]he EMF rider will reflect the difference between actual reasonable and prudently incurred fuel cost and the fuel related revenues that were actually realized during the test period under the fuel cost component of rates then in effect." N.C. Utils. Comm'n., R8-55, Annual Hearings to Review Changes in the Cost of Fuel and the Fuel Component of Purchased Power, at (c)(2). The Commission also explained in the Rulemaking Order that its goal in adopting the EMF was to allow utilities "a reasonable opportunity to recover all reasonable and prudently incurred fuel costs."

The Commission balanced that goal with a desire to continue disincentivizing inefficiency, malfeasance, and imprudence.

In 1987, this Court then considered the Public Staff's appeal opposing EMFs and held that § 62-133.2(d) did not grant the Commission authority to issue EMFs to true-up past over or under-recoveries. *Thornburg*, 84 N.C. App. at 484. This Court reasoned that if the General Assembly intended to authorize true-ups, the statute would have explicitly done so, especially because retroactive ratemaking is generally prohibited. *Id.* at 487–89. Yet, § 62-133.2(d) had no explicit reference to true-ups of over or under recoveries. *Id.*

After *Thornburg*, the General Assembly amended § 62-133.2(d) to read, in part: "The Commission shall incorporate in its fuel cost determination under this subsection the experienced over-recovery or under-recovery of reasonable fuel expenses prudently incurred during the test period . . . ." An Act to Provide Adjustments to Costs in Electric Utility Ratemaking and to Study the Question of Continuing the Authority for True-Ups, ch. 677, § 1, 1987 N.C. Sess. Laws ,1255, 1256. In Section 2 of Session Law 1987-677, the General Assembly explained:

> The enactment of this act shall be construed as clarifying rather than changing the meaning of G.S. 62-133.2 as it was previously worded and as construed by the Utilities Commission in Commission Rule R8-55 so that electric utilities will recover only their reasonable fuel expenses prudently incurred, including the fuel cost component of purchased power, with no over-recovery or under-recovery, in a manner that will serve the public interest.

*Id.* at 1257.

Certainly, Section 2 of Session Law 1987-677 expresses a policy goal to minimize or eliminate over or under-recovery. § 62-133.2(d) represents the method through which the General Assembly intended to achieve that goal while still serving the public interest: providing an opportunity to true-up past fuel costs within a one-year lookback period. It is not the role of this Court to second-guess the legislature's plainly written intent in favor of other methods it deems more effective. *See Wake Radiology Diagnostic Imaging LLC v. N.C. Dep't of Health and Hum. Servs.*, 279 N.C. App. 673, 681 (2021) ("The role of the courts is to interpret statutes as they are written."). Thus, even if DEC is correct that providing several opportunities to true-up fuel costs could better eliminate over or under-recovery, that does not override the plain language of the statute. Accordingly, DEC's argument that the legislative history of § 62-133.2(d) supports its interpretation fails.

### 4. Prior Practice

Both DEC and Public Staff contend that prior practice supports their interpretation of § 62-133.2(d). From when EMFs were expressly authorized in 1987 up until the proceedings at issue, the Commission has consistently authorized true-ups only for under-recoveries of fuel costs incurred during the test period. Public Staff and DEC identify only one exception prior to the proceedings at issue. In 2014, Dominion applied for a fuel rider and reported an under-recovery of fuel costs exceeding $16.6 million. *Application by Va. Elec. & Power Co., d/b/a Dominion N.C.,*

*Pursuant to G.S. 62-133.2 & Comm'n Rule R8-55 Regarding Fuel and Fuel-Related Costs Adjustments for Elec. Utils.*, Docket No. E-22, Sub 515, 2014 WL 7278222, at *3 (N.C.U.C. Dec. 18, 2014). Recognizing that the large under-recovery would have a great impact on fuel rates, Dominion volunteered to spread recovery of those fuel costs over 2015 and 2016 with a final true-up in the 2017 fuel proceedings. *Id.* at *23. Public Staff agreed to Dominion's proposed mitigation plan to reduce rate shock and the Commission accepted the proposal. *Id.*

Though it is ultimately the court's duty to construe statutes, we can accord great weight to long-standing interpretations by the officers tasked with executing the statute. *See State ex rel. Utils. Comm'n v. Stanly Solar, LLC*, 283 N.C. App. 160, 170 (2022); *State ex rel. Utils. Comm'n v. Pub. Staff*, 309 N.C. 195, 211–12 (1983); *Wells v. Consol. Jud. Ret. Sys. of N.C.*, 354 N.C. 313, 319–20 (2001). This is particularly true where the legislature has chosen not to amend the statutory provision. *See Wells*, 354 N.C. at 319–20. Moreover, consistently held views are granted greater consideration than more recent conflicting interpretations of a statute. *Cf. House of Raeford Farms, Inc. v. N.C. Dep't of Env't & Nat. Res.*, 242 N.C. App. 294, 310–11 (2015).

Here, decades of prior practice and legislative acquiescence demonstrate the legislative intent to limit true-ups only to under-recoveries incurred in the test period. While Dominion's under-recovery of its 2013 fuel costs was spread out over several years, that agreement, made in advance to mitigate rate increases, is distinct from

here where the Commission reached back after-the-fact and incorporated under-recovered 2022 fuel costs that were intended to be fully recovered in 2023. Moreover, that single agreement does not override decades of consistent practice. Thus, through its prior practice, the Commission, as well as the public utilities requesting fuel charge adjustments, demonstrated an understanding that § 62-133.2(d) only allowed for true-ups of fuel costs incurred during the test period. In the course of over thirty years and seven amendments to § 62-133.2, the General Assembly did not expand section (d) to allow the Commission to incorporate under-recovery of fuel costs incurred outside of the test period, reflecting that the Commission's prior understanding of § 62-133.2(d) aligned with legislative intent.

### C.    Session Law

After the Commission issued its order setting DEC's 2024 fuel rider rates, the legislature passed Session Law 2025-78 which amended § 62-133.2(d). Act of June 23, 2025, S.L. 2025-78 § 3, (codified as amended at N.C.G.S. § 62-133.2).[2] In pertinent part, the amendment removed the phrase "during the test period" and replaced it with "by the electric public utility." *Id.* Thus, after the amendment, section (d) reads: "The Commission shall incorporate in its cost of fuel and fuel-related costs determination under this subsection the experienced over-recovery or under-recovery of reasonable costs of fuel and fuel-related costs prudently incurred by the electric

---

[2] https://www.ncleg.gov/EnactedLegislation/SessionLaws/HTML/2025-2026/SL2025-78.html

public utility." DEC argues that the amendment is clarifying and should apply here.

Amendments to statutes are presumed to either change the substance of the original act or clarify it. *Ray v. N.C. Dep't. of Transp.*, 366 N.C. 1, 9 (2012). "A clarifying amendment, unlike an altering amendment, is one that does not change the substance of the law but instead gives further insight into the way in which the legislature intended the law to apply from its original enactment." *Id.* (citing *Ferrell v. Dep't of Transp.,* 334 N.C. 650, 659 (1993)). As such, clarifying amendments "apply to all cases pending before the courts when the amendment is adopted, regardless of whether the underlying claim arose before or after the effective date of the amendment." *Id.*

"To determine whether the amendment clarifies the prior law or alters it requires a careful comparison of the original and amended statutes." *Id.* at 10 (quoting *Ferrell*, 334 N.C. at 659). To begin, the title of the amendment itself "should be considered in ascertaining the intent of the legislature." *Id.* at 8 (quoting *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 812 (1999)); *Myers v. Myers*, 269 N.C. App. 237, 248 (2020). Additionally, "[i]f the statute initially 'fails expressly to address a particular point' but addresses it after the amendment, 'the amendment is more likely to be clarifying than altering.'" *Ray*, 366 N.C. at 10 (quoting *Ferrell*, 334 N.C. at 659).

For example, in *Ferrell*, a statute required that when land had been condemned by the Department of Transportation but was later no longer needed, the Department

must give the original owner the opportunity to buy back the land. *Ferrell*, 334 N.C. at 652. The original statute did not provide any guidance on what the sell-back price should be. *Id.* at 652, 659. It was later amended to include the sell-back price. *Id.* at 659. The Supreme Court of North Carolina held that the amendment was simply clarifying the statute as it existed before the amendment. *Id.*

Similarly, in *Ray*, the Supreme Court of North Carolina considered the nature of an amendment to the State Tort Claims Act ("STCA"), which provides a limited waiver of sovereign immunity. *Ray*, 366 N.C. at 4. The original statute was silent as to the application of the common law public duty doctrine, a limitation on tort liability that is separate from sovereign immunity. *Id.* Absent statutory guidance, our courts continued to develop the public duty doctrine and apply it to claims under the STCA. *Id.* at 4–6. Then, the General Assembly codified the public duty doctrine in an amendment to the STCA. *Id.* at 6–7. The Supreme Court of North Carolina held that the amendment codifying the public duty doctrine was a clarifying one because the original statute did not address the application of the doctrine and the amended statute did. *Id.* at 11. Additionally, the Supreme Court reasoned that the similarities between the codified public duty doctrine and the one developed by common law suggested that the amendment was clarifying. *Id.* The Court stated "[b]ecause the legislature left essentially all of our pre-amendment cases intact, there has not been a complete change in the law but instead only an explanation of the limited role of the public duty doctrine." *Id.*

Here, a careful examination of Session Law 2025-78 reveals that it is not a clarifying amendment, but an altering one. The section of Session Law 2025-78 which amends § 62-133.2 is titled "Fuel Cost Recovery Modifications." "Modifications," meaning changes or alterations, implies that the legislature intended to change the substance of the law. *See Modification,* BLACK'S LAW DICTIONARY (12th ed. 2024) ("A change to something; an alteration or amendment"). Additionally, Session Law 2025-78 does not explain a previously unaddressed point nor clears up an ambiguity in the original statute. The phrase "during the test period" addresses and adds a temporal limitation in the original statute. The only potential ambiguity was whether that temporal limitation applied to when the fuel cost was originally incurred or when the over or under-recovery was experienced. The amendment does not clarify that ambiguity but instead nullifies it altogether by removing the phrase "during the test period."

Thus, Session Law 2025-78 alters the substance of § 62-133.2(d). Without the phrase "during the test period," there is no language in § 62-133.2(d) limiting how far back the Commission can reach when incorporating past over or under-recoveries into the fuel rider. To hold that the complete removal of the phrase "during the test period" is merely a clarification would be to hold that the phrase served no purpose in the original statute, which contradicts DEC's own interpretation of the law and canons of statutory construction requiring that courts give meaning to every word in a statute. *See N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201 (2009) ("Because

the actual words if the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used.").

Session Law 2025-78 is also significantly distinguishable from *Ferrell* and *Ray*. In both of those cases, the original statute was completely silent on an issue and an amendment later added a clarification. Here, § 62-133.2(d) is not silent—it expressly limits which over or under-recoveries can be included in EMFs to those of fuel costs incurred during the test period. The amendment removes that limit. Additionally, where the amendment in *Ray* was largely in keeping with the pre-amendment application of the statute, Session Law 2025-78 codifies a stark deviation from the prior understanding of § 62-133.2(d).

For decades, up until the proceedings at issue, public utilities and the Commission limited true-ups to under-recoveries of fuel costs incurred during the test period. DEC's request to true-up under-recovery from fuel costs incurred the year prior to the test period represented a change from historic practice. Session Law 2025-78 provides the Commission the power to authorize such true-ups, but in doing so substantively alters § 62-133.2(d). Accordingly, the amendment to § 62-133.2(d) captured in Session Law 2025-78 does not retroactively apply here.

## D.  Relief

Having determined that the plain language of § 62-133.2(d) limits true-ups to over or under-recoveries of fuel costs incurred during the test period, we hold that the

Commission erred as a matter of law in setting the 2024 fuel rider rate to incorporate recovery of the 2022 fuel costs. Public Staff requests that we remand the case to the Commission with instructions to order a refund. We decline to so order.

Normally, where the Commission erred and authorized an unlawfully high rate, a refund to the customers is an appropriate remedy. *See State ex rel. Utils. Comm'n v. Conservation Council of N.C.*, 312 N.C. 59, 68 (1984). However, here, the recent amendment to § 62-133.2(d) in Session Law 2025-78 nullifies the effectiveness of that remedy. While Session Law 2025-78 does not retroactively apply to the issue of whether the Commission erred, it does allow for public utilities in future proceedings to reach back and true-up under-recoveries that were incurred prior to the test period. Thus, even if we ordered a refund, DEC could incorporate the 2022 under-recovery into future EMFs and recoup the refunded amount. As such, ordering a refund would not provide meaningful relief. Instead, we remand to the Commission for entrance of an order consistent with this decision.

## III.     Conclusion

For the foregoing reasons, we reverse the Commission's order and remand to the Commission for entrance of an order consistent with this decision.

REVERSED AND REMANDED.

Judges GRIFFIN and STADING concur.

Report per Rule 30(e).